CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
MAR 20 2013
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:12CR00023 |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| GRAHAM HUTSON MESSER, | ) | |
| | ) | |
| Defendant. | ) | By: B. WAUGH CRIGLER |
| | ) | U.S. MAGISTRATE JUDGE |

In accordance with the provisions of Title 28 U.S.C. § 636(b)(3), and upon the defendant's consent, this case was referred to the undersigned to conduct a plea hearing.

**DEFENDANT'S RESPONSES TO RULE 11 INQUIRY**

On March 8, 2013, the United States filed a one count Information against the defendant charging in Count One that between February 13, 2009 until February 1, 2012, the defendant, in the Western District of Virginia, acting as, and being an officer, director, agent, and employee of a person engaged in the business of insurance whose activities affect interstate commerce and being involved in a transaction relating to the conduct of affairs of such a business, willfully embezzled, abstracted, purloined, and misappropriated any of the moneys, funds, premiums, credits, and other property such person so engaged, where the amount or value so embezzled, abstracted, purloined, and misappropriated exceeded $5,000, all in violation of 18 U.S.C. § 1033(b)(1). (Dkt. No. 28.) On the same day, the defendant and his counsel appeared before the undersigned to enter a guilty plea to the sole count set forth in the Information.[1]

---

[1] The defendant was originally indicted by a Grand Jury on September 12, 2012. (Dkt. No. 3.) However, he waived his right to be charged by an Indictment returned by a Grand Jury on the charges set forth in the Information. (Dkt. No. 30.) He further acknowledged that he had the right to proceed before a District Judge, and he expressly consented to proceed before the undersigned. (Dkt. No. 31.) As will be set forth below, should the presiding District Judge accept this Report and Recommendation, the United States will be moving, in due course, to dismiss the Indictment.

The defendant was placed under oath and testified that his full legal name is Graham Hutson Messer, he was born on August 7, 1980, and he had received a Bachelor's degree. The defendant stated that he can read, write, and understand the English language. The defendant further stated that he was fully aware of the nature of the charges against him and the consequences of pleading guilty to those charges. He informed the court that he suffered no physical or mental condition and was not under the influence of any substance that would impair his ability to understand what the court was saying or the nature of the proceedings. He testified that he had received a copy of the Information and that he had fully discussed with his counsel the charges set forth therein, the maximum punishment for the charges, any defenses thereto, and his case in general. The defendant further acknowledged his right to be indicted by a Grand Jury, the fact he already had been indicted on similar charges, which are still pending. He then revealed to the court that he was freely and voluntarily waiving his right to be charged by indictment on the instant charge and signed a waiver which was filed with the court. (Dkt. No. 30.) The defendant testified that he understood that the offense set forth in Count One is a felony, and if his plea is accepted, he will be adjudged guilty of that offense.

The defendant acknowledged that the maximum statutory penalty for Count One is a $250,000 fine and/or imprisonment for a term of ten years, together with a term of supervised release of three years. The defendant was informed that parole has been abolished, and that if he is sentenced to incarceration, he will not be released on parole, but on supervised release, a violation of which could result in additional incarceration. The government was not seeking forfeiture, but the defendant stated that he abandoned any interest in the items seized as evidence in the prosecution of this case. The defendant was informed that he may be required to pay restitution to compensate the victims of his insurance fraud and, if so, must make a good faith effort to do so and comply with all the terms set forth in the Plea Agreement discharging his financial responsibility. The defendant testified that he also understood that, upon conviction, he

will be required to pay a mandatory special assessment of $100 per felony count. Finally, the defendant testified that is was agreed that he reserved the right to challenge some of the amounts for which the government may seek restitution, but that he would be obligated to pay the amounts determined by the court. With that exception, he agreed that the stipulated facts filed with the court accurately set forth all factual elements to sustain his plea of guilty.

The defendant was informed that, under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow in determining a reasonable sentence in a criminal case. He was then informed that the Sentencing Guidelines are no longer mandatory, but the sentencing judge may apply them in an advisory fashion in determining a reasonable sentence. The defendant testified that he and his counsel had discussed how the Sentencing Guidelines might apply in his case. The defendant also testified that he understood that the court would not be able to determine the applicable guideline range, for advisory purposes, until after a presentence report has been prepared and both parties have been given an opportunity to challenge the reported facts and application of the Guidelines. The defendant stated that he understood that the eventual sentence imposed may be different from any estimate his attorney had given him, or any recommendation by the government, and that the court has the authority to impose a sentence that is either higher or lower than that called for by the Guidelines, so long as the sentence is not greater than the statutory maximum for the offense to which the defendant is pleading guilty. He also acknowledged that, should that occur, he would not be entitled to withdraw his plea of guilty.

The defendant acknowledged that the parties agreed that the 2012 edition of the United States Sentencing Guidelines Manual is applicable. He further acknowledged that, in the Plea Agreement, it had been stipulated that Sentencing Guidelines 2B1.1(a), 2B1.1(b)(1), 2B1.1(b)(2)(A), and 3B1.3 are applicable to his conduct, and that he understood how those provisions would impact sentencing. The defendant also stated that he understood that even if he

3

fully cooperates with law enforcement, the government is under no obligation to file a motion to reduce his sentence for substantial assistance, and if the government makes the motion, it is up to the court to determine how much of a departure, if any, should be made. The defendant stated that he understood that, contingent upon his acceptance of responsibility, continued cooperation in the sentencing process, and fulfillment of his duties under the Plea Agreement, the government will recommend a two-level (2) reduction under USSG § 3E1.1(a), and, if applicable, the government will move that he be given an additional one-level (1) reduction under USSG § 3E1.1(b). The defendant agreed that he had knowingly and voluntarily waived his rights to request or receive any records pertaining to the investigation or prosecution of his case, including any records that may be sought under the Freedom of Information Act or the Privacy Act of 1974. The defendant agreed he would submit a financial statement, if called upon to do so. He further agreed that from the time of his signing the plea agreement, or the date he signs the financial statement, whichever is earlier, he would not convey anything of value without authorization from the government. The defendant acknowledged his monetary obligations under the plea agreement and that the amounts determined were due immediately and subject to immediate enforcement.

The defendant acknowledged that he was waiving (giving up) his right to have a jury determine beyond a reasonable doubt the facts alleged in the Information, including any facts that could impact sentencing. The defendant testified that he understood that he had the right to a trial by a jury, in addition to the following rights, which will be waived or given up if his guilty plea is accepted:

1. The right to plead not guilty to any offense charged against him;
2. The right at trial to be presumed innocent and to force the government to prove his guilt beyond a reasonable doubt;
3. The right of assistance of counsel at trial and in any subsequent appeal;
4. The right to see, hear, and cross-examine witnesses;

5. The right to call witnesses to testify on his own behalf and to the issuance of subpoenas or compulsory process to compel the attendance of witnesses;
6. The right to decline to testify unless he voluntarily elects to do so in his own defense;
7. The right to a unanimous guilty verdict; and
8. The right to appeal a guilty verdict.

The defendant testified that he understood that, under the terms of the agreement, he was waiving his rights to appeal, but that he was not waiving his right to appeal or have his attorney file a notice of appeal as to any issue which cannot by law be waived. The defendant acknowledged that he had agreed to waive his right to collaterally attack his conviction or sentence in the case, unless such attack is based on ineffective assistance of counsel or a constitutional defect in the jurisdiction of the court. The defendant was informed that, if he chose to appeal, the government could treat such as a breach of the plea agreement and recharge him. The defendant further acknowledged that the plea agreement only binds the United States Attorney's Office for the Western District of Virginia and no other state or federal prosecutor or enforcement agency in any other District or jurisdiction.

The defendant testified that he understood that, if found guilty, he may be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm. He stated that no one had threatened, intimidated, or forced him to enter the Plea Agreement or plead guilty, and he was pleading guilty of his own free will because he was, in fact, guilty. The defendant stated that he was satisfied with the advice and representation given to him in this case by his counsel and that he believed the representation had been effective. The defendant asked the court to accept his plea of guilty to Count One.

**THE GOVERNMENT'S EVIDENCE**

The defendant and the Government agreed to a Stipulation of Facts. The Stipulation of Facts having been filed in open court, the evidence presented therein regarding the offenses charged is as follows:

**Introduction:**

GRAHAM MESSER ("MESSER") stole funds from his victims while operating as an insurance agent in the Western District of Virginia. MESSER would tell his victims to send him their insurance premiums directly, rather than remitting them to the insurance company. MESSER would then pocket the premiums and in some cases give false certificates of insurance to his victims, causing them to believe they had insurance when they did not. When victims would discover they had no insurance, MESSER would in some instances continue to lie and provide false statements and false documents to perpetuate the scheme.

**Victim: Piedmont House, Inc.**

The Piedmont House located in Charlottesville, Virginia, is a transition home for men who have been released from prison. MESSER had been the agent for the Piedmont House's insurance policies. Piedmont House made several payments to MESSER to obtain insurance after MESSER asked that the institution send its payments directly to him.

In the winter of 2011, Piedmont House learned that their policy issued by Chartis Insurance had been cancelled for non-payment. They contacted MESSER, who gave them various policy numbers and stated they were valid and that the matter was a misunderstanding. However, the policy numbers were not valid, as Laura Anderson from the Piedmont House learned when she contacted Chartis Insurance directly.

At first, MESSER claimed that the Piedmont House account had been moved but was still valid. In January of 2012, MESSER claimed that the Piedmont House account was, in fact, at Granite State Insurance (which is a subsidiary of Chartis Insurance) but was still in effect. However, that too was false.

During a subsequent investigation it was determined that MESSER had never made any payments on the Piedmont House worker's compensation policy that he had established. Instead, MESSER had opened an account with Chartis Insurance on June 27, 2011, but never made payments, then opened another account on September 12, 2011, but again, made no payments. The only payments Chartis Insurance ever received for this policy were from Laura Anderson directly.

Ms. Anderson contacted MESSER on January 30, 2012 by telephone. Law enforcement monitored and recorded this phone call. During the call, MESSER stated that the money from the Piedmont House was applied to the account of a homeless shelter. However, MESSER claimed that he sent Chartis Insurance payments and stated that he would send a copy of the cancelled check. MESSER never did.

Initially, the Piedmont House mailed payments to MESSER's business address, Messer Insurance Agency on Berkmar Drive in Charlottesville. The mailings occurred from one of three Charlottesville locations: a mail box on Harris Street; a mail box on Monticello Avenue; and from the downtown post office. Later, Piedmont House mailed three payments to MESSER at his address in Bremo Bluff, Fluvanna County, Virginia.

Other than one payment on July 1, 2011, which MESSER sent to Legacy Insurance, checks received by MESSER were deposited into MESSER's personal bank account

7

The total amount that the Piedmont House paid to MESSER under false pretenses was $22,684.57.

A number of other victims were involved in this case as well.

### Victim: Lanneau Hauling

Curtis Lanneau is the owner of Lanneau Hauling and believed he purchased commercial auto insurance from Farmer's Insurance through MESSER for his hauling company. Pursuant to MESSER's instructions, Lanneau sent premium payments in the form of checks mailed from Sandston, Virginia to MESSER's post office box in Bremo Bluff, Virginia. However, Lanneau later discovered that Farmers Insurance never received any of his payments and in fact had never heard of Lanneau Hauling.

MESSER had provided false Certificates of Insurance by electronic mail to Pamela Lanneau, Lanneau's mother. When Lanneau's truck broke down and had to be towed away, Lanneau contacted MESSER to make a claim and MESSER stated that he should receive a check. Lanneau never received a check. MESSER later told Lanneau that he would deposit the check directly into Lanneau's account, but again the money never appeared. Upon investigation, Lanneau found that MESSER had no license to sell insurance and that he had never had a policy at all. The total amount that Lanneau paid MESSER was $2,235.02.

### CA Booker Hauling

Charles Booker runs a freight hauling business and believed that he had purchased commercial auto insurance from MESSER, using Farmers Insurance Group, beginning December 2, 2010. No such insurance existed. MESSER directed Booker to send him the

payments personally. On two occasions, MESSER wrote receipts to Booker, listing a false policy number on the receipt. The total amount that Booker paid MESSER was $1,122.00.

**Spotless Express**

John Curry operated a business called Spotless Express and also believed that he had purchased insurance from MESSER. Spotless Express Auto Detailing is a mobile service that details cars at a location designated by the customer. Curry reported that he purchased business owner's insurance from MESSER. MESSER provided a Farmer's Certificate of Insurance for that coverage. In addition, Curry also purchased garage keeper's liability insurance from MESSER from Nautilus Insurance Company.

When Curry became the victim of employee embezzlement, he contacted the insurance company only to find out that he did not, in fact, have coverage. He also needed to respond to a claim from a customer who stated that one of Curry's employees stole and damaged property. Curry contacted MESSER, who sent him a check drawn on Messer Insurance Agency for $600 for the customer's claim. MESSER also told him he would receive a check for $6,400, but he did not receive that check.

MESSER told Curry that he would have to change insurance companies and that his new company would be Main Street America Group. When he had a second claim regarding stolen equipment, he sent on the claim to MESSER. However, after having received no reply, Curry contacted Main Street America Group directly and learned that no claim had been filed. He contacted MESSER, who told Curry that he would be receiving two checks, one for $6,000 and one for $14,000. He never received either check.

The Virginia Bureau of Insurance investigated Curry's case. They learned that Curry did have coverage with Main Street America Group, but that his claim had not been filed with them as MESSER had promised. In addition, Main Street America discovered that MESSER had not been a licensed agent at the time he wrote the policy.

The Bureau of Insurance also learned that the certificate of insurance that Curry received from Nautilus Insurance was a forgery and had never been issued; in fact, MESSER had no authority to write a policy for Nautilus Insurance. Finally, they learned that the commercial auto policy that MESSER had documented for Curry also did not exist and that the policy number on Curry's certificate of insurance was not valid.

Curry does not have documentation regarding the amounts that he paid MESSER or the amounts of the claims he submitted; the paperwork was given to MESSER. He was able to document one payment for $67 payable to "Farmers".

### Susan Smith

Susan Smith contracted with MESSER to obtain homeowners and automobile insurance. She had paid MESSER beginning in 2008 via a direct withdrawal from her bank account, but in August of 2010, she began to get letters demanding proof of insurance. She was then billed $2,346 directly to cover the debt. When she contacted MESSER directly, he told her that he would correct the problem.

Later, in June, 2011, a tree branch from Smith's property landed on a neighbor's garage, and she sought to make a claim. Smith contacted Farmer's Insurance directly and learned that she had not had insurance since August of 2010 and had been without homeowner's coverage for a ten-month period, although she had been making payments to MESSER. She also learned that

her mortgage company, Bank of America, had sent $900 for a premium payment on her account that had been deposited into MESSER's account.

Smith's payments included the following checks, which were mailed to MESSER at his Berkmar Drive address in Charlottesville, Virginia: Check #3027044 in the amount of $994.80 on November 10, 2010.

### CCD Cabinets

Thomas Perry and Todd Hoar operate CCD Cabinets and believed they had obtained worker's compensation and other insurance through MESSER. A former secretary for CCD Cabinets sent MESSER checks by mail. CCD received a Notice of Cancellation from Farmer's Insurance dated February 8, 2010. The total amount that the defendant collected from CCD Cabinets and deposited into his account, without sending on to the insurance company, was $1,637.51.

### B-Line Logistics

B-Line Logistics is a medical transport company located in Charlottesville, Virginia. B-Line used MESSER as an agent to obtain commercial auto insurance through Farmer's Insurance and liability and workers compensation insurance through Chartis Insurance beginning in October of 2010. When B-Line began to receive cancellation notices, they contacted MESSER, who told them that the company had made a mistake and to disregard the notices. MESSER informed B-Line that its insurance was still in effect.

The Virginia Bureau of Insurance investigated and learned that B-Line had a worker's compensation policy issued for April 17, 2011 through April 17, 2012, through AFC Insurance, but that the policy was cancelled two months after issuance for non-payment of premium. The

11

policy had been paid in part, but $1,252 was still owed. As for the certificate of insurance that MESSER had given B-Line from Chartis Insurance, the investigation disclosed that the document was a forgery. Further, it was determined that although B-Line had an auto policy, the policy was in fact a personal auto policy rather than what was supposed to be a commercial auto policy. It was also determined that the account was delinquent.

MESSER had also provided B-Line with an insurance form listing Legacy Insurance Solutions. In February of 2011, MESSER moved to the State of Florida and began work at Legacy Insurance Solutions ("Legacy Insurance") in Tallahassee, Florida. MESSER led Legacy Insurance to believe that he was currently licensed in Virginia and had just sold his practice there. FBI Agent James Lamb investigated and learned that while at Legacy Insurance, MESSER had set up worker's compensation coverage for B-Line. However, that policy was cancelled due to non-payment.

Legacy Insurance learned of the problem when B-Line Logistics contacted them and reported it. Legacy Insurance confronted MESSER, who denied having taken any money from B-Line and claimed that the client was merely confused and mistaken. MESSER denied having a post office box, in contravention to B-Line's claim that it had been sending payments to the post office box. Legacy Insurance fired MESSER that day upon discovering this issue and cut all ties to him. Legacy Insurance later learned that MESSER had deceived them about having a license to sell insurance in Virginia and Florida.

B-Line regularly made payments to MESSER by mailing them from Ruckersville, Virginia to MESSER's address in Bremo Bluff, Virginia, totaling $17,687.56.

**Landscape Creations and Nursery**

Landscape Creations and Nursery retained MESSER as an insurance agent for a worker's compensation policy as well as personal and business automobile policies. Landscape Creations first made payments to MESSER in the spring of 2011. They mailed their payments to MESSER's post office box in Bremo Bluff, Virginia. The total amount that MESSER collected from Landscape Creations was $600.00.

However, Landscape Creations and Nursery contacted Farmer's Insurance about her policy, and Farmer's informed her that she had no policy with them. When she contacted MESSER, he insisted that Landscape Creations did have a policy. He told them that their policy was now with Legacy Insurance. In fact, Landscape Creations and Nursery was without any insurance from May, 2011 through February, 2012. Ms. Brown discovered her lack of coverage following an auto accident in which she was involved in February of 2012.

**Ernest Thurston and Sons**

Ernest Thurston and Sons is a business in the Charlottesville, Virginia area that used MESSER as an agent. Thurston had understood that they purchased worker's compensation insurance, general liability insurance, and automobile insurance from MESSER through Erie Insurance.

Ernest Thurston delivered checks totaling $2,248.00 to MESSER, either in person or by mail. However, when Thurston suffered a loss due to windshield damage and a towing bill, they discovered that they did not have insurance. Thurston contacted Erie Insurance, who informed him that he had never had automobile insurance for his company vehicles.

**Terrell Burruss**

On September 8, 2010, Terrell Burruss visited MESSER to obtain commercial insurance on his 2001 Freightliner truck. He gave MESSER a $156.74 payment and MESSER sent a certificate of insurance by fax to a company with which Burruss was doing business. Burruss then gave MESSER a blank check to set up an automatic debit to pay for the insurance.

When Burruss noticed that he never received any debits, he contacted MESSER, who told him that he never set up the policy and that the policy was cancelled for non-payment. However, MESSER agreed to set up a new policy. Burruss gave MESSER a check for $310 and paid $150 more in cash. MESSER gave Burruss a new certificate of insurance.

On December 16, 2010, Burruss had an automobile accident and called MESSER to file a claim. MESSER told him to file a claim with the other driver's insurance. Burruss contacted Farmer's Insurance directly and learned that he never had insurance with Farmer's Insurance. Burruss contacted MESSER again on a three-way call with Farmer's Insurance. During this conversation MESSER stated that he had actually set up the policy with Grange Mutual Casualty Company. That statement was also false.

Burruss again confronted MESSER, who agreed to pay him the money directly for his damages. He gave Mr. Burruss $2,000 on January 6, 2011, and agreed to pay the rest later. MESSER never paid the remaining balance.

The Virginia Bureau of Insurance investigated this case. Investigators learned that MESSER had no authority to settle claims or give letters or receipts on Farmer's Insurance letterhead. Investigators also learned that the certificates of insurance MESSER gave Burruss were fabricated and false. The policy numbers did not match the numbers on the certificates. In

14

addition, MESSER was not authorized to issue insurance from an insurer other than Farmer's Insurance.

Investigators interviewed MESSER and requested the files for Burruss' case. The investigators showed MESSER the September 8, 2010 certificate of insurance, but MESSER denied writing the policy in September.

Later, MESSER spoke with investigators again and admitted to making the certificate of insurance before it was approved. He admitted to taking the money, depositing it to his account, and then not returning it to Burruss even though he knew that Burruss never actually received insurance. MESSER claimed that he took the $156 in cash on September 8, 2010, and then never remitted the money or set up a policy and subsequently "forgot" about Burruss. In addition, MESSER stated that he deposited the money from December 1, 2010 and used some of it on another insured's account. He admitted that Burruss never received a policy of any kind, up to and including when he filed a claim in December 2010. He also acknowledged that he used his own personal money to pay $2,000 for Mr. Burruss' towing expense.

The total amount that Mr. Burruss paid to MESSER was $616.74.

**Michael Morris**

Michael Morris is an individual who believed he had obtained insurance through MESSER. He contacted MESSER after his previous insurance company dropped him following a tornado. Thereafter, he made monthly payments for auto and homeowner's insurance over the telephone at a rate of $126.00 per month via his debit card. Morris later learned that he had been without homeowner's insurance for over one year.

**FINDINGS OF FACT**

Based on the evidence presented at the plea hearing, the undersigned now submits the following formal findings of fact, conclusions and recommendations:

(1) The defendant is fully competent and capable of entering into a plea agreement and making an informed plea;

(2) The defendant is aware of the nature of the charges and the consequences of his plea;

(3) The defendant knowingly and voluntarily entered a plea of guilty to the offense in Count One of the Information; and

(4) The evidence presents an independent basis in fact containing each of the essential elements of the offenses to which the defendant is pleading guilty.

Thereupon, the defendant was arraigned on Count One of the Information and pled guilty thereto.

**RECOMMENDED DISPOSITION**

Based upon the above findings of fact, the undersigned FINDS that defendant has knowingly, voluntarily and freely entered his plea of guilty to Count One of the Information as well as executed the Plea Agreement in this case. The undersigned RECOMMENDS that the court accept the defendant's plea of guilty to Count One of the Information and DIRECTS that a presentence report be prepared. A sentencing hearing hereby is scheduled for June 10, 2013 at 11:00 a.m. before the presiding District Judge in Charlottesville.

**NOTICE TO PARTIES**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C): Within fourteen days (14) after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. The presiding District Judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which

objection is made. The presiding District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the undersigned. The judge may also receive further evidence or recommit the matter to the undersigned with instructions.

Failure to file timely written objections to these proposed findings and recommendations within fourteen days could waive appellate review. At the conclusion of the fourteen-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk is hereby directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____
United States Magistrate Judge

_3-20-2013_
Date